Terry W. CARLSON, Relator,

v.

COMMISSIONER OF REVENUE, Respondent.

No. C6–93–1346.

Supreme Court of Minnesota.

June 3, 1994.

Thomas M. Regan, Bloomington, for relator.

James W. Neher, Sp. Asst. Atty. Gen., Tax Litigation, St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

Relator Terry Carlson appeals a Tax Court judgment upholding an order of the Commissioner of Revenue assessing personal liability against Carlson, pursuant to Minn.Stat. §§ 290.92, subd. 1(4) (1988) and 297A.01 subd. 2 (1988), for LMJ Enterprises, Inc.'s ("LMJ") unpaid sales and withholding taxes payable from October of 1987 through March of 1988 in the amount of $64,529.39. We affirm.

The issues before the Tax Court were (1) whether Carlson retained legal control of the payment of wages within the meaning of Minn.Stat. § 290.92, subd. 1(4) (1988) so as to be personally liable for unpaid withholding taxes owed by LMJ, even though he and Greer, LMJ's co-founder, had agreed that he would not be involved in the day-to-day management of the restaurant operated by LMJ; and (2) whether Carlson was a "person" within the meaning of Minn.Stat. § 297A.01, subd. 2 (1988) who had "control, supervision or responsibility" for filing returns and making payments of sales taxes owed by the corporation, so as to be personally liable for the unpaid sales taxes despite the agreement.

LMJ was organized in early 1987 by Carlson and his brother-in-law Bob Greer to pur-

chase Greenstreets restaurant. Each owned 50 percent of the stock of the corporation, and Carlson was named president. The restaurant was purchased for approximately $300,000. Carlson invested approximately $95,000 for the down payment. Greer had over ten years' experience in restaurant management. Carlson had no background in restaurant management. Carlson and Greer agreed that Carlson's function was to provide funds, while Greer would handle the day-to-day management of the restaurant.

After forming LMJ and acquiring the restaurant, Carlson continued his former jobs, working as president (with no ownership interest) of a mortgage company and also for a real estate sales company. Greer operated the restaurant, hiring and firing employees, handling payroll and taxes, and making other business decisions. Carlson was consulted only once about hiring in connection with the hiring of the assistant manager. Carlson had check signing authority, and on isolated occasions (when he was present at the restaurant as a diner) signed business checks prepared in Greer's absence by the head waitress for the immediate payment of a vendor. However, Carlson never signed a tax return or a check to pay taxes.

Carlson received limited distributions from the operation of the restaurant including: (1) one-half of the proceeds from video game machines amounting to between $50 and $150 a month; (2) the use of a Mercedes 300E leased by the corporation for approximately $500 per month; (3) occasional six-packs of beer or wine taken from the restaurant; and (4) approximately $3,000 withdrawn from the corporation and used to pay for the installation of air conditioning in his home. Greer was also furnished with a car and one-half of video game machine proceeds.

In December of 1987, during a ten-day to two-week period in which the restaurant was prohibited from purchasing liquor at wholesale until delinquent taxes were paid, Carlson and Greer purchased liquor at retail to be resold by the restaurant. Carlson did not inquire about the possibility of additional tax liabilities, and accepted Greer's assurances that the restaurant was doing fine. Carlson ate free meals at the restaurant with family and business acquaintances about three times a week.

Carlson received the news that Greer had been admitted to an alcohol and drug treatment center through a phone call from a restaurant employee on a Saturday late in January 1988. Carlson contacted INCA, a restaurant management company, for assistance in running the restaurant. Within four days of Greer's admission to treatment, Carlson met with INCA representatives. Then, without advising Greer, Carlson retained INCA to manage the day-to-day operation of the Restaurant, and within nine days of Greer's admission INCA had taken over management. After hiring INCA, and while Greer was in chemical dependency treatment, Carlson stopped payment on Greer's paycheck. Carlson along with one of the principles of INCA then dismissed the assistant manager, and refused to issue him a final paycheck. After reviewing the financial condition of the restaurant, INCA advised Carlson that there was no money in the corporation accounts and no funds available for continuing operations, and that the company should file a Chapter 11 bankruptcy. Carlson, using receipts from the operation of the restaurant, paid an attorney a $3,000 retainer to prepare a Chapter 11 bankruptcy petition which was filed on March 11, 1988. Carlson took the petition to the treatment center for Greer to sign so that both his and Greer's signatures were contained on the petition.

After the bankruptcy petition was filed, Carlson dismissed Greer from his position with the corporation by having an attorney write Greer a termination letter. The corporation then made an application for the appointment of INCA as the official management consultants to operate the restaurant. Following the filing of the bankruptcy petition, Carlson understood that he was prohibited by the Bankruptcy Court from taking any action on behalf of the corporation including signing checks. Carlson received at least one paycheck from the corporation for services in a non-management position, following the filing of the bankruptcy petition.

In April of 1988, Carlson moved to Florida, after accepting an offer of employment there.

In December of 1988, Carlson transferred his interest in the corporation to an undisclosed party. He received no cash, stock or other consideration.

The Tax Court found that Carlson possessed legal control, either individually or jointly, with Greer, over the payment of withholding taxes prior to March 11, 1988, and the remission of sales tax prior to March 11, 1988. We affirm.

In reviewing the findings of fact made by the Tax Court, this court ascertains whether there was sufficient evidence to support the Tax Court's decision. *Benoit v. Commissioner of Revenue*, 453 N.W.2d 336, 339 (Minn.1990). Conclusions of law, however, are freely reviewable. *Id.* In determining whether Carlson is personally liable for the unpaid withholding and sales taxes, we look first to Minn.Stat. § 270.10 subd. 4 (1988) (repealed 1990) which gives the Commissioner of Revenue the authority to:

> [A]ssess personal liability against any officer * * * of a corporation, * * * who as an officer, director, employee, or member, falls within the personal liability provisions of section 290.92, [unpaid withholding taxes] * * * [and] 297A, [unpaid sales taxes] * * * for taxes arising thereunder which are due and owing by that corporation * * *.

Minn.Stat. § 290.92, subd. 6(c)(7)(a) (1988) (repealed 1990) further provides that:

> [E]very employer who fails to pay to or deposit with the Commissioner any sum or sums required * * * to be deducted, withheld and paid, shall be personally and individually liable to the state for the sums.

"Employer" is defined by Minn.Stat. 290.92, subd. 1(4) as:

> [A]ny person, including * * * corporations transacting business in or deriving any income from sources within the state of Minnesota for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that if the person for whom the individual performs or performed the services does not have legal control of the payment of the wages for such services, the term employer, * * * means the per-

son having legal control of the payment of such wages. As used in the preceding sentence, the term "employer" *includes* * * * *officers of corporations who have legal control, either individually or jointly with another or others, of the payment of wages.*

*Id.* (emphasis added). We must determine whether Carlson, as an officer of the corporation, had legal control over the payment of wages making him personally liable for the corporation's unpaid withholding taxes.

This court reviewed a similar set of facts in *Benoit v. Commissioner of Revenue*, 453 N.W.2d 336 (1990). In *Benoit*, the relator was the founder, president, and sole shareholder of a corporation. Carlson, like Benoit, was president, but rather than being sole founder or sole shareholder, held 50 percent of the shares, the other 50 percent being held by Greer, the co-founder of the corporation. In *Benoit* a security agreement was invoked which required all corporate funds be deposited with the corporation's lender who then determined which creditors would be paid. *Id.* at 338–39. The lender advised Benoit that if he attempted to pay the taxes without its authorization, the company would be declared in default on the security agreement and Benoit would be fired. Nevertheless, this court held Benoit personally liable for the unpaid taxes stating:

> [T]hat the sales proceeds were subsequently turned over to a secured creditor does not change the fact that it was * * * Benoit, Inc. officers who were responsible for and did in fact file the tax returns. * * * *a corporate officer cannot escape personal liability by contracting to breach the statutorily imposed duty to pay * * * taxes.*

*Id.* at 344 (emphasis added).

Carlson similarly argues that an agreement prevented him from exercising control over the corporation. Carlson contends that from the inception of the corporation he and Greer had an agreement that he would provide the funding, while Greer would manage the day-to-day operations of the restaurant. Carlson argues that, although he held the title of president, he had no control over the company during the time Greer was with the company. However, Carlson's actions after

learning of Greer's admission to chemical dependency treatment do not support his argument that he lacked legal control of the company.

Carlson always had check signing authority. Further, upon learning of Greer's departure Carlson exercised his hiring and firing authority by dismissing Greer and the assistant manager. Carlson also stopped payment on Greer's paycheck, and refused to give the assistant manager a final paycheck. Finally, Carlson held himself out as a person in control of the corporation by filing a Chapter 11 Bankruptcy Petition.

Thus, even if, as Carlson argues, he delegated his control of the day-to-day operations of the company to Greer through their agreement, he remains liable because as this court found in *Benoit*, a corporate officer cannot escape personal liability by contracting to breach the statutorily imposed duty. An officer may delegate some or all of the duties and powers of an office; however, that officer "remains subject to the standard of conduct for an officer with respect to the discharge of all duties and powers so delegated." Minn. Stat. § 302A.351 (1992). This court held in *Benoit* that the management of the corporation was never transferred to the lender through the security agreement, but that Benoit remained in legal control. Similarly, while Carlson by agreement delegated the day-to-day management duties to Greer, he never relinquished his management or check signing powers. Carlson remained in legal control of the corporation even though he chose not to exercise that control, and is personally liable for unpaid withholding taxes owed by the corporation.

■ We must next determine whether Carlson was a person within the meaning of Minn.Stat. § 297A.01, subd. 2 who had "control, supervision or responsibility" for filing returns and making payments of sales taxes so as to be personally liable for unpaid sales taxes. Carlson argues that whether or not he had legal control over the payment of wages, he did not have actual "control, supervision, or responsibility" for making sales tax

payments and thus cannot be held liable for them.

■ In *Benoit*, this court looked to federal case law in determining when personal liability for unpaid sales taxes and unpaid withholding taxes should be imposed on a corporate officer.[1] Under federal law liability is imposed when "the officer is a 'responsible person' who willfully fails to pay over the taxes." 453 N.W.2d at 342. The test for responsible person status is a functional one which focuses on those persons who have the power and responsibility to see that the taxes are paid. *Id.* (citing *Taubman v. United States*, 499 F.Supp. 1133, 1137 (E.D.Mich. 1978), *aff'd sub nom. United States v. Intercontinental Indus., Inc.*, 635 F.2d 1215 (6th Cir.1980). Control and influence over the disbursement of funds and priority of payments to creditors are the most important elements. *Id.*

We noted in *Benoit* that the following list of factors is useful in determining who is a responsible person:

(1) The identity of the officers, directors and stockholders of the corporation and their duties;

(2) The ability to sign checks on behalf of the corporation

(3) The identity of the individuals who hired and fired employees;

(4) The identity of the individuals who were in control of the financial affairs of the corporation;

(5) The identity of those who had an entrepreneurial stake in the corporation.

453 N.W.2d at 344 (citing *United States v. Davidson*, 558 F.Supp. 1048, 1052 (W.D.Mich.1983)).

Applying the factors outlined in *Benoit*, we conclude Carlson was a responsible person who had control, supervision and responsibility for making payments of sales taxes. First, Carlson was president of the corporation. Second, Carlson had the ability to sign checks on behalf of the corporation as evidenced by the fact Carlson occasionally

---

**1.** It should be noted that federal case law while helpful is not determinative because it is based upon federal statutes which adopt different standards and definitions than those in Minnesota statutes.

signed business checks while at the restaurant. Third, after Greer went into treatment, Carlson exercised the power to hire and fire employees. Carlson discharged both Greer and the assistant manager. Fourth, after Greer went into treatment, Carlson exercised control of the financial affairs of the corporation, contracting with INCA to manage the restaurant and signing a bankruptcy petition. Fifth, Carlson had an entrepreneurial stake in the corporation. He was a 50 percent shareholder who received monthly benefits in the form of car payments and video game machine receipts. Accordingly, we affirm the Tax Court's finding that Carlson is personally liable for unpaid sales taxes.

Finally, Carlson argues that the lack of funds available in the corporation's accounts during the nine days he was actively involved in the day-to-day operations of the restaurant denied him the ability to pay the corporation's outstanding tax obligations. However, the amount of funds available does not affect the determination of whether Carlson had control of the corporation and is personally liable for the unpaid taxes.

Affirmed.