**Mark W. PETERSON, Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. C8–96–2304.

Supreme Court of Minnesota.

July 17, 1997.

Mark W. Peterson, Minneapolis, pro se.

Hubert H. Humphrey, III, Attorney General, State of Minnesota, Craig R. Anderson, Assistant Attorney General, Tax Litigation Division, St. Paul, for Respondent.

## OPINION

ANDERSON, Justice.

Relator Mark W. Peterson appeals a Minnesota Tax Court judgment affirming an order of the Commissioner of Revenue assessing Peterson with personal liability for the unpaid sales taxes of Recreational Concepts, Inc., a Minnesota corporation. The tax court held that Peterson, who was a lender to the corporation but not an officer, director, or employee, was personally liable and affirmed the commissioner's order. We affirm.

David Igel and Greg Love incorporated Recreational Concepts, Inc. (corporation) in April 1993 and each had an ownership interest in the corporation. The business had been in existence for approximately 11 years before it was incorporated. The corporation chartered boats in the summer and rented snowmobiles in the winter. Although the corporation did not have an active board of directors, never issued stock certificates, and failed to observe many corporate formalities, Love acted as its president and Igel acted as its vice president. During the relevant period, Patrick Reese was employed as the corporation's comptroller.

In the fall of 1993, the corporation was in need of additional funds, and relator Mark W. Peterson was contacted in November 1993 to become an investor. Peterson is an attorney, practicing in Minneapolis, who, according to his law office letterhead, is a sole practitioner and a criminal trial specialist. Peterson agreed to provide funds to the corporation. Between November 11, 1993 and January 14, 1994, he loaned the corporation $125,000. The corporation executed two promissory notes in Peterson's favor—a $20,000 note executed November 11, 1993, and a $100,000 note executed November 18, 1993. Each of the notes provided for interest at 8 percent per annum and was due on demand. Igel and Love executed a security agreement on behalf of the corporation on November 18, 1993. The security agreement provided Peterson with a "first security interest" in 9,500 shares of common stock which was "represented by all of the certificates of stock owned by [the corporation]." The security agreement also provided that, upon default

by the corporation, Peterson had all of the rights and remedies of a secured party.

An unrelated third party, Gail Brekke, also loaned funds to the corporation. On December 15, 1993, the corporation executed a promissory note for $25,000 in Brekke's favor and a security agreement giving Brekke a security interest in 9,500 shares of common stock—again represented to be all of the certificates of stock owned by the corporation.

The corporation began to experience financial problems in January 1994. Igel testified that Love had entertained friends at the corporation's expense and failed to take responsibility for work. Igel testified that, because of the problems with Love, Peterson became involved in the corporation's day-to-day decisions in order to assist Igel. In an attempt to "rein in" Love and to have Love focus on marketing for the corporation, a new organizational chart was distributed on January 12, 1994. The chart referred to Peterson as "General Counsel" and as a "Senior Partner" and placed him at the top of the organization, with control over the following areas: legal, financing, accounting, taxes, personnel, insurance, and contracts. It showed that Reese, the corporation's comptroller, reported directly to Peterson. The chart showed that Igel was in charge of operations and that Love was in charge of marketing. A memorandum distributed with the chart referred to Peterson, Love, and Igel as the "senior partners" and provided that the "senior partners will exercise authority to make business and personnel decisions only within their areas of responsibility, and should not be consulted nor expected to act upon matters outside those parameters." In his brief to this court, Peterson admitted that he prepared the organizational chart and the memorandum distributed with the chart.

On January 13, 1994, Peterson and Igel sent Love a memorandum stating that they had met to discuss Love's future role in the corporation and would be "willing to allow [Love] to continue as a representative" under certain conditions. These conditions included: that Love work only on matters that were assigned to him by Peterson and Igel; that Love no longer have the authority to bind the corporation to contracts; that Love no longer receive a salary and instead be paid only a sales commission; and that Love return his company vehicle.

In response to this memorandum, Love sent a letter to Peterson, stating that Igel and Love were the only shareholders of the corporation, that Love was its president and chief executive officer, and that Peterson was not its general counsel. Love also sent a memorandum to Igel, stating that he would not comply with the conditions in the January 13, 1994 letter and that he was relieving Igel of his duties as vice president. Igel testified that, after receiving Love's letter, he did not return to the corporate offices until he understood that Love was gone and that Peterson was in control of the corporation.

On January 17, 1994, Peterson sent Love, Igel, and Brekke a letter in which Peterson demanded immediate repayment of $100,000, plus interest, pursuant to his promissory notes. The letter provided that, unless such payment was made, "I shall immediately exercise all rights and remedies available to me, pursuant to the [security agreement], * * * including seizure of all corporate assets pursuant to the Uniform Commercial Code." Igel testified that "[b]ecause the corporation was not able to pay those funds [Peterson's] security was in the stock of the corporation and at that point it was my understanding that [Peterson] had owned the corporation from that point on." Reese testified that it was his understanding that "Mr. Peterson had exercised a right on his note, took control of the corporation, and Mr. Love was asked to leave."

On January 19, 1994, Peterson sent Love another letter providing, "I am presently the owner, subject to [Gail Brekke's] note, of all of the corporate assets." Peterson stated that he would negotiate a price for Love's "secondary interest in the corporation," but not until Love resigned.

Although Love was no longer officially involved in the corporation's day-to-day operations, Igel testified that Love continued to represent himself to others as the corporation's president and continued to drive a company vehicle. Igel believed that Love

never abandoned his claim that he was the president.

Igel testified that, beginning in mid- to late-January 1994, Igel did not make any major decisions without contacting Peterson. After mid-January 1994, the corporation had no formal organization, but Igel stated that the "practical organization" was that Igel spent "most of the time in the office" and that Peterson spent "some time in the office." Igel testified that Peterson reviewed some contracts, including leases, and participated in discussions with personnel. Igel also testified that, from December 1993 through March 1994, his understanding was that personnel decisions would be discussed with Peterson.

In early February 1994, Peterson became less involved in the corporation's day-to-day operations, though Igel and Peterson remained in "constant contact." Igel testified that he and Peterson would discuss "the day's events, the day-to-day operations, any problems that we may have, the amount of receipts from the day prior generally, the status of reservations. Basically every facet of the [corporation] we would discuss." On February 2, 1994, Peterson and Igel issued a memorandum stating that Igel would have exclusive responsibility over administration and operations and that Peterson had become the chairperson of the board and would advise Igel. In mid-February 1994, the snow melted, and the corporation ceased to have revenue from snowmobile rentals.

As the corporation's comptroller, Reese worked under the supervision of Igel and Peterson. Throughout the relevant period, Reese handled the corporation's finances, including the checking account, and was responsible for the generation of financial statements. Reese had check-signing authority and was responsible for paying the corporation's bills. Reese testified that, when he needed to pay a bill, he obtained authority to do so from Igel or Peterson. He also testified that he regularly consulted with Igel before paying bills and sometimes consulted with Peterson before paying specific bills.

Reese was primarily responsible for paying the sales taxes. His duties included preparing the tax forms, writing the checks, and mailing the tax payments to the Minnesota Department of Revenue (department). Reese reassured Igel that all of the taxes had been paid. There is no evidence that Peterson ever instructed Reese not to pay taxes.

Reese testified that he made out the checks for the January and February sales taxes, but inadvertently failed to sign the checks. The department did not cash the checks and returned them to the corporation because they had not been signed. When the checks were returned, the corporation had "little to no funds in the bank." When Reese's employment with the corporation ended in March or April of 1994, the corporation had not resubmitted the payment for the sales taxes to the department.

Peterson testified that he was not an officer or director of the corporation and he never had check-signing authority. He testified, "The only contact I received was regarding [the] infusion of money," consisting of seven payments to the corporation from November 1993 through January 1994 totaling $125,000. Peterson also testified that, after early February 1994, he was no longer involved in the corporation's day-to-day operations, but maintained contact with Igel, providing Igel with advice.

Love became reinvolved in the corporation in April 1994. In June 1994, Igel resigned and transferred whatever ownership interest he had in the corporation to Love. In the late summer of 1994, Love notified Igel that there was a tax deficiency.

On October 1, 1994, the Commissioner of Revenue (commissioner) issued an order assessing Peterson with personal liability for both sales and withholding taxes for the taxable periods ending December 31, 1993, January 31, 1994, and February 28, 1994, totaling $13,270.24.[1] Peterson administratively

---

1. In September 1994, the commissioner also assessed personal liability against Igel, who had acted as the corporation's vice president, for both sales and withholding taxes for the taxable periods ending December 31, 1993, January 31, 1994, and February 28, 1994. *See Igel v. Commissioner of Revenue*, 566 N.W.2d 706 (Minn., 1997).

appealed the assessment, but the commissioner denied Peterson's appeal. Peterson then appealed to the tax court, contending that there was no factual or legal basis for the commissioner's assessment.

The record is incomplete with respect to the amount of sales taxes payable for the relevant period. At trial, the commissioner conceded that only sales taxes, not withholding taxes, were at issue and that the only sales taxes at issue were for the taxable periods ending January 31 and February 28, 1994. In what appeared to be an offer of proof, the commissioner's attorney stated that the parties had stipulated that, if Nancy Runyan, an employee of the department had testified, she would have stated that the corporation had a sales tax deficiency "for the taxable periods ending January 31 and February 28, 1994 in an amount slightly less than $10,000." [2] The tax court responded, "There has been no evidence that [Peterson] had any 'control' prior to January 17th, 1994." Although the record at trial indicates that the court recognized that there was a discrepancy between the evidence submitted by the commissioner and the commissioner's order and although the record indicates that the court held an off-the-record discussion on this issue, the court did not address this discrepancy, either on the record at trial or in the court's subsequent order.

The tax court affirmed the commissioner's order imposing personal liability against Peterson. The court found the following: that Peterson "never held an authorized position, either as an officer or director"; that Peterson took control of the corporation's finances on January 17, 1994, and by doing so, controlled how the corporation's money was to be spent; that Peterson "thought he was in control, especially of [the corporation's] finances"; that Peterson "held himself out as a person in control of the [c]ompany's financial and tax issues"; that "he was primarily responsible for the payment of the [c]ompany's creditors"; and that Peterson and Igel had several meetings to discuss paying various creditors, but that they did not discuss paying the IRS or the department because Peterson and Igel believed that the withholding and sales taxes had been paid. The court concluded that Peterson had the power and responsibility to insure that the sales taxes were paid, but that he failed to exercise his power and responsibility.

The tax court affirmed the commissioner's order, held that Peterson was personally liable for "sales tax owing for the periods from January 17 through and including February 28, 1994," and found that Peterson was not liable for any sales taxes prior to January 17, 1994. But the commissioner's order had actually assessed Peterson for both sales and withholding taxes and had assessed Peterson for taxes for December 1993, as well as all of January and February 1994. Therefore, while the court clearly did not intend to affirm the total amount of taxes assessed by the commissioner in its order, it failed to determine the actual amount of sales taxes payable for the relevant period.

Peterson brought a post-trial motion before the tax court for amended findings or a new trial. Peterson moved to submit additional evidence, including evidence that another party had a perfected security interest that had priority over any security interest Peterson had in the corporation. Peterson also contended that the court precluded him from presenting his case fully at trial. The court denied Peterson's motion, concluding that Peterson's additional evidence was not newly discovered and that the court "did not discourage or preclude [Peterson] from offering any evidence."

Peterson appeals both the tax court's order affirming the assessment and the court's order denying his motion for amended findings or a new trial.

## I.

In reviewing whether the tax court's decision is justified by the evidence,

**2.** The commissioner's attorney was apparently referring to testimony from the *Igel* proceeding, which was heard before the trial in the instant case. Although the parties and the tax court discussed the possibility of whether the court might consider some evidence submitted in *Igel*, the court did not make any clear ruling on the issue. We have not relied upon any facts from the *Igel* proceeding in deciding this case.

this court reviews the record to determine whether there is sufficient evidence to support the decision. *Carlson v. Commissioner of Revenue*, 517 N.W.2d 48, 51 (Minn.1994). The tax court is in the best position to evaluate the credibility and sincerity of witnesses. *Manthey v. Commissioner of Revenue*, 468 N.W.2d 548, 550 (Minn.1991). Conclusions of law and questions of statutory construction, however, are subject to de novo review. *Green Giant Co. v. Commissioner of Revenue*, 534 N.W.2d 710, 711 (Minn.1995); *Carlson*, 517 N.W.2d at 51. The commissioner's orders are presumed to be valid and correctly determined; the taxpayer has the burden of demonstrating the incorrectness or invalidity of the commissioner's orders. Minn. Stat. §§ 270.68, subd. 3; 289A.37, subd. 3 (1996).

Minnesota Statutes section 270.101 gives the commissioner authority to assess an individual with personal liability for the unpaid sales taxes of a corporation. Minn.Stat. § 270.101, subds. 1, 3 (1992). Section 270.101 provides:

> Subdivision 1. **Liability imposed.** A person who, either singly or jointly with others, has the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes and who fails to do so, or a person who is liable under any other law, is liable for the payment of taxes, penalties, and interest arising under chapters 296, 297, 297A [the Sales Tax Statute], and 297C, or sections 290.92, 349.212, and 349.2121.
>
> Subd. 2. **Person defined.** The term "person" includes, but is not limited to, a corporation, estate, trust, organization, or association, whether organized for profit or not, an officer or director of a corporation, a member of a partnership, an employee, a

third party (including, but not limited to, a financial institution, lender, or surety), and any other individual or entity.

*Id.* § 270.101, subds. 1, 2. Section 270.101 was enacted in 1990 and is effective for taxes becoming due on or after August 1, 1990. Act of Apr. 24, 1990, ch. 480, art. 2, §§ 2, 19, 1990 Minn. Laws 1033, 1097, 1106.

Prior to enactment of section 270.101, the commissioner could assess only an "officer, director, or employee" who fell within the personal liability provisions of individual enumerated statutes, including section 297A, the section governing sales taxes.[3] *See* Minn. Stat. § 270.10, subd. 4 (1988) (repealed 1990). When determining whether a taxpayer was personally liable for sales taxes that became due prior to the enactment of section 270.101, we applied five factors established in *Benoit v. Commissioner of Revenue*, 453 N.W.2d 336 (Minn.1990):

(1) The identity of the officers, directors and stockholders of the corporation and their duties;

(2) The [authority] to sign checks on behalf of the corporation;

(3) The identity of the individuals who hired and fired employees;

(4) The identity of the individuals who were in control of the financial affairs of the corporation; and

(5) The identity of those who had an entrepreneurial stake in the corporation.

*Id.* at 344. In applying the *Benoit* factors, we looked to federal case law, but we have noted that federal case law "is not determinative because it is based upon federal statutes which adopt different standards and definitions than those in Minnesota statutes." *Carlson*, 517 N.W.2d at 52 n. 1; *see Benoit*, 453 N.W.2d at 344. This court has noted

---

**3.** The former version of the personal liability statute was contained in a general statute section governing the authority of various governmental bodies over tax matters. The subdivision governing the commissioner's authority to assess personal liability provided:

> Subd. 4. **Orders assessing personal liability.** The commissioner may, based upon information available to the commissioner and within the prescribed period of limitations for assessing the underlying tax, assess personal

liability against any officer, director, or employee of a corporation, or a member or employee of a partnership, who as an officer, director, employee, or member, falls within the personal liability provisions of section 290.02, chapter 296, 297, 297A, 297C, or sections 349.212 and 349.2121, for taxes arising thereunder which are due and owing by that corporation or partnership.

Minn.Stat. § 270.10, subd. 4 (1988) (repealed 1990).

that the determination of whether a taxpayer is personally liable for a corporation's sales taxes involves a functional test "which focuses on those persons who have the power and responsibility to see that the taxes are paid." *Carlson*, 517 N.W.2d at 52. Section 270.101 has maintained that focus.

This court has applied the *Benoit* factors in three previous cases which involved sales taxes that became due prior to the enactment of section 270.101. In *Benoit*, this court reversed the tax court and held that the president of a corporation was personally liable for payment of sales tax, noting that the president was also the sole shareholder of the corporation, was the only person in the corporation with any authority, had the authority to sign checks, and prepared and signed the Minnesota sales tax returns. *Benoit*, 453 N.W.2d at 341, 344. In *Carlson*, 517 N.W.2d at 52–53, this court affirmed the tax court and held that the president of a corporation was personally liable for payment of sales taxes, noting that the president had actually signed business checks, had fired employees, had exercised control over the financial affairs of the corporation, and was a 50 percent shareholder in the corporation. In *Krech v. Commissioner of Revenue*, 557 N.W.2d 335, 340–41 (Minn.1997), this court reversed the tax court and held that an employee of a corporation was not personally liable for unpaid sales taxes, noting that the employee was not an officer and had no authority to hire and fire employees. In *Krech*, this court further noted that, although the employee had the authority to sign checks, he did not exhibit control over corporate finances, and although the employee owned stock in the corporation, his ownership of less than 1 percent of the stock did not establish that he had an entrepreneurial stake in the corporation. *Id.* at 341–42.

This court recently applied the *Benoit* factors in a case which involved sales taxes that became due after the enactment of section 270.101. In *Igel v. Commissioner of Revenue*, 566 N.W.2d 706 (Minn., 1997), which is related to this case, this court held that Igel, the vice president of the same corporation at issue in the instant case, was personally liable under section 270.101 for the corporation's unpaid sales taxes for January and February 1994. Although this court applied the *Benoit* factors in *Igel*, the taxpayer in *Igel* was an officer of the corporation, and admitted at trial before the tax court that he had check-signing authority, was involved in hiring and firing, was involved in meetings to discuss how creditors would be paid, and had an entrepreneurial stake in the corporation.

■ In the instant case, the commissioner has assessed a lender, who is not an officer, director, or employee, with personal liability for the corporation's taxes. Because the sales taxes at issue became due after August 1, 1990, section 270.101 is applicable. The issue of what standard should govern the assessment of personal liability against a lender who is not an officer, director, or employee is an issue of first impression before this court. The *Benoit* factors were enumerated when the applicable statute allowed the commissioner to assess only an officer, director, or employee. The legislature has since broadened the commissioner's authority to assess personal liability by enacting section 270.101, which explicitly allows the commissioner to assess third parties such as lenders. Although the *Benoit* factors are still informative, we focus instead on the statutory requirement that Peterson "either singly or jointly with others, [had] the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes and [failed] to do so." *See* Minn.Stat. § 270.101, subd. 1. The evidence demonstrates that this statutory requirement has been met in the instant case.

After January 17, 1994, although Peterson occupied no official position, he exercised significant control over the corporation. Peterson supervised Reese, the employee who had check-signing authority and who was primarily responsible for paying sales taxes. On January 12, 1994, Peterson distributed an organizational chart and memorandum that showed him at the head of the organization, with control over several key areas including financing, accounting, taxes, and personnel. The chart referred to Peterson as a "Senior Partner" and showed that Reese reported to

Peterson. Peterson repeatedly asked Reese for copies of the corporation's financial documents. Reese believed that Peterson was in control of the corporation and Reese consulted with Peterson before paying specific bills.

The evidence also indicates that Peterson effectively prevented Love, who had been acting as the president of the corporation, from controlling the corporation during the relevant period. On January 13, 1994, Peterson and Igel sent Love a memorandum stating that Peterson and Igel would be "willing to allow [Love] to continue as a representative" of the corporation if Love would work only on matters assigned to him by Peterson and Igel. Love responded that he was the president of the corporation and would not comply with Peterson and Igel's demand. Peterson then sent Love and Igel the January 17, 1994 letter in which Peterson demanded immediate repayment of $100,000, plus interest, pursuant to his promissory notes, and stated that "any continued activity by Mr. Love on behalf of the corporation, including but not limited to presence at the corporate office * * * constitutes a dilution of corporate assets * * *." On January 19, 1994, Peterson sent Love a letter demanding Love's resignation.

After January 17, 1994, Igel, the only remaining officer at the corporate offices, believed that Peterson was in control of the corporation. Igel testified that from that point, he did not make any major decisions without "contacting Mr. Peterson specifically about those decisions in terms of any kind of financial decisions or any other decisions affecting the corporation." Although Peterson's day-to-day involvement at the corporation ended in early February 1994, he maintained constant contact with Igel, Igel kept him apprised of "every facet" of the corporation, and he gave Igel advice concerning the corporation. Igel testified that personnel decisions, like most of the other decisions in the corporation, were to be discussed with Peterson.

The evidence demonstrates that from January 17 through February 28, 1994, Peterson, either singly or jointly with Igel and Reese, had supervision over the paying of sales taxes and that the sales taxes were not

paid. Thus, we conclude that the record supports the tax court's decision that Peterson is personally liable for the corporation's unpaid sales taxes.

## II.

Peterson also appeals the tax court's order denying his motion for amended findings or a new trial. Peterson contends that there was material evidence not introduced at trial that would have caused the court to find that Peterson was not personally liable. Peterson has argued two grounds in support of his motion: (1) that Peterson discovered evidence after trial that another creditor of the corporation had a perfected security interest, and (2) that the court precluded Peterson from presenting other evidence at trial.

■■■ The decision to grant or deny a new trial rests with the tax court and its decision will not be reversed unless the court abused its discretion. *200 Levee Drive Ass'n v. County of Scott*, 532 N.W.2d 574, 578 (Minn.1995). Peterson has not pointed to any evidence demonstrating that the court abused its discretion. The court denied Peterson's motion, concluding that the additional evidence Peterson wished to submit was not newly discovered. Peterson admitted that he had not checked with the Minnesota Secretary of State for UCC filings prior to trial. Because Peterson could have discovered the UCC filing had he exercised reasonable diligence by checking with the secretary of state, his post-trial discovery of the other creditor's perfected security interest does not warrant a new trial. *See* Minn. R. Civ. P. 59.01(d).

Peterson further contends that the tax court precluded him from presenting his case fully at trial. Peterson does not contend that the court was biased against him; rather, he contends that, in discussions held off the record after the close of the commissioner's case, the court "indicated that additional testimony was not necessary" and that he "understood" the court's comments to mean that he would prevail. In denying Peterson's motion, the tax court stated that it had "carefully reviewed the relevant portions of the transcript and conclude[d] that this Court did not

discourage or preclude [Peterson] from offering any evidence." There is no indication in the record that Peterson asked the court for an opportunity to present additional evidence. We conclude that the tax court did not abuse its discretion in denying Peterson's motion for amended findings or a new trial.

### III.

Because (1) the tax court decided that Peterson was personally liable for sales taxes owing for January 17 through February 28, 1994, (2) the commissioner's order assessed liability for both withholding and sales taxes and assessed liability for a greater time period, (3) the court made no finding as to the actual amount of sales taxes owing for January 17 through February 28, 1994, and (4) the record does not contain evidence as to the actual amount of sales taxes owing for that period, we are unable to determine the amount of sales taxes owing for January 17 through February 28, 1994. We remand for the tax court to determine the amount of unpaid sales taxes for which Peterson is liable.

Affirmed and remanded.

BLATZ, J., took no part in the consideration or decision of this case.