Robert Scott LARSON (D & B Dry
Cleaners, Inc.), Relator,

v.

COMMISSIONER OF REVENUE,
Respondent.

No. C2–97–1093.

Supreme Court of Minnesota.

June 25, 1998.

Robert Scott Larson, Wayzata, for Relator.

Hubert H. Humphrey III, Attorney General, Craig R. Anderson, Assistant Attorney General, Tax Litigation Division, St. Paul, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

Relator Robert Scott Larson appeals from the determinations of the Commissioner of Revenue and the Minnesota Tax Court that he is personally liable for the sales and withholding tax deficiencies of D & B Cleaners, Inc. for various periods in 1990, 1991, and 1992. The tax court held that Larson was an "employer" with "legal control" over D & B's payment of wages, within the meaning of Minn.Stat. § 290.92, subd. 1(4) (1996), and a "person" with "control, supervision or responsibility" for D & B's payment of sales

tax, as defined in Minn.Stat. § 297A.01, subd. 2 (1996). We affirm, albeit on somewhat different grounds.

In October 1989, David Pearson purchased a Pilgrim Cleaners franchise and shortly thereafter formed a corporation, D & B Dry Cleaners, Inc., through which the franchise would be run.[1] D & B opened two retail stores, one of which contained a processing plant, but soon encountered financial difficulties.

Pearson met the relator, Robert Scott Larson, late in the summer of 1990. At the time, Larson was vice president and a principal shareholder of Planning Associates, Inc., a consulting firm which provided business marketing and finance planning services. Effective October 1, 1990, Planning Associates agreed to construct an accounting system for D & B, evaluate D & B's operating systems and procedures, and provide marketing and advertising advice.

In November 1990, Larson and two business associates formed Suburban Laundries Corporation (SLC). Larson was the corporation's sole stockholder, and by early 1991, he was the sole officer and director as well. Larson signed most, if not all, of SLC's checks.

On November 27, 1990, Larson and Pearson executed a "Limited Joint Venture Agreement" on behalf of SLC and D & B, respectively. Under this agreement, D & B "designate[d] SLC to receive and deposit its receipts and disburse its funds * * * in accordance with the terms of th[e][a]greement."[2] While the agreement authorized SLC to make payments on D & B's behalf to certain vendors, D & B's prior approval was required for other expenditures.

SLC promised to tender up to $75,000 to D & B[3] with the understanding that the funds "be used first for the retirement of any and all sales and/or payroll tax debt * * * and subsequently * * * for the purpose of retirement of other debt, accounts payable and/or short-term investment." In exchange, D & B granted SLC a secured interest in "all [of D & B's] daily cash receipts," "all operational and leasehold rights to" the two retail stores and the processing facility, and certain other assets. In addition, D & B was to pay SLC $1,000 plus 15 percent of gross revenues each month. Out of these monies, SLC paid the amounts due under equipment leases, while the remaining funds (usually about $1,000) represented "repayment for [SLC's] funding." In the event D & B was sold or foreclosed upon, the agreement entitled SLC "to fifteen percent (15%) of the gross sale proceeds, together with the balance of any principal remaining on funds tendered."

Pearson testified that pursuant to the agreement, nearly all of D & B's daily receipts were deposited into SLC's account. Pearson testified that he did not keep track of what he deposited with SLC, nor did Larson provide him with regular statements; if Pearson wanted information, he had to go to Larson's house to look at the records on Larson's computer.

According to Pearson, SLC began to pay some of D & B's bills, while Pearson paid others with funds that SLC transferred to D & B. On occasion, Pearson reserved cash from the daily receipts for bills that needed to be paid immediately. Pearson testified that Larson decided who would pay each bill and when it would be paid. Pearson acknowledged that as president of D & B, he had the authority to determine where the company's receipts went; however, once D &

1. Pearson bought the franchise with his brother, Richard Pearson; however, Richard Pearson surrendered his stock in D & B to David Pearson in the spring of 1991. Richard Pearson continued to work for D & B on a part-time basis until sometime in early 1992.

2. The minutes of D & B's November 20, 1990, board of directors' meeting contain this resolution:

RESOLVED, that since First Minnesota has closed our checking account because of too

many over-drafts [sic], authorization is approved for Suburban Laundries Corp., Scott Larson, owner[,] to take full control of all financial responsibilities for all of D & B Dry Cleaners Inc.'s revenue with all the responsibilities for reserving in trust all money for all the taxes so all taxes can be paid when due.

3. The funds being advanced came from David Pearson's IRA and passed through the "investment channel" of SLC.

B's receipts were in SLC's account, he had to request them from Larson in order to gain access to them. Pearson testified that sometime in 1991 or 1992, Larson took over the preparation of D & B's sales and withholding tax returns. Pearson would sign the forms Larson had prepared, and Larson would transfer the funds necessary to pay the taxes. In addition, Larson and Pearson concurred that Larson began handling D & B's payroll sometime in 1992. Larson prepared the payroll checks, and Pearson signed them. Pearson conceded that Larson neither signed a tax return for D & B nor had the authority to sign checks on D & B's checking account.

In November 1991, Larson and David Pearson formed an S corporation called Cleaners Plus, Inc. (CPI). Pearson was chairman, president, and CEO; Larson was secretary, treasurer, and CFO.[4] Larson testified that CPI was formed "to * * * get business separate and apart [from D & B] that would generate additional income, but would also give the opportunity for D & B to process."

CPI remained inactive until January 5, 1993, when it entered into an agreement ("the acquisition agreement") to acquire D & B's assets. Larson signed the acquisition agreement on CPI's behalf, and David Pearson signed it for D & B. Among other things, the acquisition agreement stipulated that CPI would retain D & B's employees, would become responsible for compensating the employees, would assume liability for "any and all payroll and other taxes and/or insurance premiums accruing thereon," and would assume D & B's lease obligations. Pearson, who received no cash in the transaction, resigned the presidency of CPI as of April 1, 1993. He remained an employee of CPI for the balance of the year.

Pearson testified that he became aware of certain tax deficiencies in November 1990 and called them to Larson's attention. According to Pearson, some of the deficiencies were rectified, but "in other cases the response was, there is no money." All told, no sales tax was paid on D & B's behalf for the months of November and December 1990, March 1991 through August 1992, and October and November 1992. In addition, no withholding taxes were paid for the first quarter of 1991 through the third quarter of 1992.

The Minnesota Department of Revenue concluded that both Larson and Pearson were personally liable for the deficiencies. On December 29, 1994, the department issued two "Order[s] Assessing Personal Liability" to Larson, pursuant to Minn.Stat. § 270.101 (1996). As of that date, the total tax liability (including penalties and interest) equalled $26,591.19. On April 13, 1996, the department denied Larson's appeal of the assessments. After a one-day hearing and post-trial briefs were filed, the Minnesota Tax Court affirmed the department's orders.[5]

On appeal to this court, Larson challenges most of the tax court's findings of fact and both of its conclusions of law. Moreover, he asserts that he was denied due process of law. We address these contentions in turn.

I.

Larson challenges most of the tax court's findings of fact largely on the ground that he introduced contravening evidence.[6] The record suggests that the tax court's findings had to be based largely upon the court's assessment of the witnesses' credibility. After recognizing and weighing the witnesses' con-

---

4. Pearson and Larson transferred their shares of CPI stock to their wives sometime after incorporating. In May 1992, Larson's wife bought the CPI shares held by Betty Pearson, David's wife. Thus, Larson's wife owned all of CPI's shares from May 1992 onward. However, Larson and Pearson remained the officers of the corporation—Pearson chiefly because he personally held the Pilgrim license.

5. The tax court reduced the amount for which Larson was liable in accordance with the applicable statute of limitations.

6. Larson also challenges the tax court's finding that Larson controlled D & B. Larson asserts that the court "abuse[d] its discretion * * * by applying '[s]ubstance over form'" to make this finding, thus violating due process. It is well settled that "on tax questions a court is free to look to the substance, not just the form, of a transaction." *Midwest Fed. Sav. & Loan Ass'n v. Commissioner of Revenue*, 259 N.W.2d 596, 599 (Minn.1977) (citing *Transport Leasing Corp. v. State*, 294 Minn. 134, 199 N.W.2d 817 (1972)).

flicting interests, the court ultimately "f[ou]nd [Larson's] arguments and testimony incredible."

██ When the tax court's findings of fact are challenged on appeal, "this court reviews the record to determine whether there is sufficient evidence to support the decision." *See F–D Oil Co. v. Commissioner of Revenue*, 560 N.W.2d 701, 704 (Minn.1997). We decline to address each of Larson's contentions individually in this opinion. Rather, it is sufficient to say that after conducting a thorough review of the record, we are confident that the evidence amply supported the tax court's findings, and we are not "left with a firm conviction that a mistake has been made." *Montgomery Ward & Co. v. County of Hennepin*, 482 N.W.2d 785, 788 (Minn. 1992).

## II.

██ Larson challenges the tax court's two conclusions of law. First, the tax court concluded that Larson was an "employer" with "legal control of the payment of [D & B's] wages" within the meaning of Minn.Stat. § 290.92, subd. 1(4) and, thus, was personally liable for D & B's withholding tax deficiencies. Second, the court concluded that Larson was personally liable for D & B's sales tax deficiencies, because he had the "control, supervision or responsibility" for filing sales tax returns and making sales tax payments, under Minn.Stat. § 297A.01, subd. 2 (1996). These conclusions of law are subject to de novo review. *See Peterson v. Commissioner of Revenue*, 566 N.W.2d 710, 715 (Minn. 1997); *F–D Oil*, 560 N.W.2d at 704.

In the past, this court has determined an individual's personal liability for sales taxes by reference to Minn.Stat. § 270.10, subd. 4 (1988) (repealed 1990), the sales tax chapter's definition of a "person," and the five factors established in *Benoit v. Commissioner of Revenue*, 453 N.W.2d 336, 344 (Minn.1990). *See Krech v. Commissioner of Revenue*, 557 N.W.2d 335, 339 (Minn.1997).[7] These are the factors the tax court considered before concluding that Larson was personally liable for the sales tax deficiencies.

In the case of an individual's personal liability for withholding taxes, the court has relied upon the now repealed section 270.10, the *Benoit* factors, and Minn.Stat. § 290.92, subd. 1(4), which defines "employer" for withholding tax purposes. *See Krech*, 557 N.W.2d at 339. In this case, the tax court applied the "employer"/"legal control" standard of section 290.92, subdivision 1(4), as well as the *Benoit* factors, with respect to the withholding tax deficiencies.

Since August 1, 1990, however, personal liability for the payment of taxes, penalties, and interest has been imposed upon "[any] person who, either singly or jointly with others, has the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting [sales and withholding] taxes and who fails to do so." Minn.Stat. § 270.101, subd. 1 (1996).[8] This court recently acknowledged that while the *Benoit* factors may still

---

7. The sales tax statute defines "person," in pertinent part, as

any individual, * * * officer, director, * * * joint venture, * * * municipal or private corporation * * *, * * * * or any other group or combination acting as a unit * * *. As used in the preceding sentence, the term "person" includes, but is not limited to, directors and officers of corporations * * * who, either individually or jointly with others, have the control, supervision or responsibility of filing returns and making payment of the amount of tax imposed by this chapter.

Minn.Stat. § 297A.01, subd. 2 (1996). The *Benoit* court described its test for "responsible person status" as:

a functional one which focuses on those persons who have the power and responsibility to see that the taxes are paid. The courts have looked at the following factors * * *:

(1) The identity of the officers, directors and stockholders of the corporation and their duties;

(2) The ability to sign checks on behalf of the corporation;

(3) The identity of the individuals who hired and fired employees;

(4) The identity of the individuals who were in control of the financial affairs of the corporation; and

(5) The identity of those who had an entrepreneurial stake in the corporation.

*Benoit*, 453 N.W.2d at 344 (citations omitted).

8. The term "person" "includes, but is not limited to, a corporation * * * and any other individual or entity." Minn.Stat. § 270.101, subd. 2 (1996).

be "informative," the statutory standard of section 270.101 controls in determining whether an individual is personally liable for sales tax deficiencies. *See Peterson,* 566 N.W.2d at 716; *see also Igel v. Commissioner of Revenue,* 566 N.W.2d 706, 708 (Minn. 1997). By its express terms, section 270.101 applies with equal force with respect to withholding tax deficiencies. Thus, because the deficiencies at issue in this case accrued after August 1, 1990, section 270.101 supplies the proper standard by which to determine whether Larson is personally liable for D & B's sales and withholding tax deficiencies. *See Peterson,* 566 N.W.2d at 715–16. Larson is personally liable if he "ha[d] the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes" for D & B. Minn.Stat. § 270.101, subd. 1.

That the tax court cited the wrong statutes is of no moment. To reach its decision, the court necessarily had to conclude that Larson "either individually or jointly with others, ha[d] the control, supervision or responsibility of filing [sales tax] returns and making payment of the amount of [sales] tax." Minn.Stat. § 297A.01, subd. 2. Because the pre–1990 standard is virtually identical to the governing standard of section 270.101, and because Larson's duties were identical with respect to sales and withholding taxes, we will affirm the tax court's conclusions if our de novo review demonstrates that they are supported by the record.

The *Peterson* court, applying section 270.101, held that personal liability for a corporation's sales tax deficiencies could be imposed upon a lender who:

- occupied no official position in the corporation, although he portrayed himself on an organizational chart as "senior partner," general counsel, and the head of financing, accounting, and taxes;
- supervised the employee who was responsible for paying the sales taxes and for signing the corporation's checks;
- repeatedly requested copies of the corporation's financial data;
- was consulted regarding virtually all financial matters, including the payment of certain bills;
- effectively prevented the corporation's president from carrying out his duties and convinced others in the corporation that he (the lender) was in control; and
- spent time in the corporation's offices and maintained "constant" contact when he was not there.

*See Peterson,* 566 N.W.2d at 716–17.

There are some striking parallels between the facts of *Peterson* and this case. To be sure, Larson was not a director, officer, shareholder, or employee of D & B. Nonetheless, Larson represented himself and Planning Associates as being able to help D & B through its financial difficulties, and Pearson perceived that Larson was assuming responsibility for managing the company's finances. No more than six or seven weeks after becoming involved with D & B, Larson set up another corporation (SLC), through which all or most of D & B's daily cash receipts, as well as the proceeds of Pearson's IRA, were funneled to D & B. Larson was SLC's sole stockholder, officer, and director and signed most (if not all) of its checks. As part of the arrangement between SLC and D & B, SLC—or, for all intents and purposes, Larson—held a secured interest in D & B's assets, receipts, leasehold rights, and the like.

Because Larson effectively controlled D & B's purse strings, Pearson had to consult Larson with respect to virtually all financial matters. Although Larson may not have had absolute power to veto D & B's expenditures, he certainly had input as to which bills would be paid and when, and he released the funds to pay them. In fact, according to Pearson, Larson at times asserted that withholding and/or sales taxes could not be paid because there were no funds to do so, though evidence also indicated that he had urged the taxes be paid when there were available funds. *See Carlson v. Commissioner of Revenue,* 517 N.W.2d 48, 53 (Minn.1994) (stating that "the amount of funds available does not affect the determination of whether [an individual] * * * is personally liable for the unpaid taxes" of a corporation).

Larson was in daily contact with Pearson regarding D & B matters, and he maintained D & B's financial records in his home. As

the years passed, Larson spent more and more time at D & B's office and he assumed full responsibility for D & B's payroll. He and Pearson jointly incorporated CPI, over which Larson's family soon obtained sole control and which acquired D & B's assets. Perhaps most notably, Larson apparently prepared D & B's withholding and sales tax returns and checks for Pearson's signature throughout the period in question.

Thus, in view of all the circumstances, we find ample support for the tax court's conclusion: Larson "ha[d] the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes" on D & B's behalf. Minn.Stat. § 270.101, subd. 1.

### III.

 Larson contends that his due process rights under the federal and state constitutions were violated on two main grounds.[9] First, Larson contests the department of revenue's "unilateral ability to assess any party * * * without due process of law before a judicial officer in a court of competent jurisdiction." Second, Larson argues that the burden of proof should not have been placed upon him.

 It is well-settled that the legislature may authorize administrative agencies to engage in quasi-judicial decision-making, provided the right of appeal is preserved. *See, e.g., Anderson v. Commissioner of Highways,* 267 Minn. 308, 317, 126 N.W.2d 778, 784 (1964) (holding that commissioner could suspend driver's license prior to hearing in district court). The legislature did so in enacting section 270.10, subdivision 4. What is essential is that Larson had notice and an opportunity to be heard. Hence, Larson's first contention fails.

---

**9.** Larson argues that the tax court denied him the opportunity to cross-examine a revenue department official regarding the computation of the assessments. Larson was given the opportunity to cross-examine the official; however, he abandoned this line of questioning when the court agreed that the tax computation issue had not been raised in Larson's appeals to the department and the tax court. This does not constitute a denial of the opportunity to cross-examine.

Larson also asserts that the tax court erred in refusing to admit IRS Form 4180, which documents a discussion between Pearson and IRS

 Likewise, Larson's second contention is without merit. As we have stated,

Minnesota statutes provide that the commissioner[ ] [of revenue's] orders are presumed to be valid * * * and the taxpayer has the burden of demonstrating the incorrectness or invalidity of the commissioner's orders. Minn.Stat. §§ 270.68, subd. 3[,] 289A.37, subd. 3 (1996). Placing the burden of proof on the taxpayer in civil tax cases is in accordance with the common[-]law principle of placing the burden on the party who has particular knowledge of the relevant facts.

*F–D Oil,* 560 N.W.2d at 707. The burden properly was upon Larson to show why the commissioner's order was incorrect. He failed to do so.

We affirm.

GILBERT, J., took no part in the consideration or decision of this case.

employees in May 1993. In fact, while it expressed doubts about the form's relevance, the court stated that it would admit the form; however, Larson failed to offer it into evidence.

Finally, Larson argues that the tax court erred in not taking judicial notice of Pearson's individual income tax returns for the years in question, for the purpose of showing Pearson's "pattern of self-serving actions." As Larson acknowledges, however, "the tax records * * * would [not] abrogate any potential liability of [Larson]"; thus, they are irrelevant.