**Scott L. STEVENS, Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

**No. A11–2020.**

Supreme Court of Minnesota.

Nov. 14, 2012.

Mark A. Pridgeon, Edina, MN, for the relator.

Lori Swanson, Attorney General, Jeremy D. Eiden, Assistant Attorney General, Saint Paul, MN, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Relator Scott Stevens challenges several personal liability assessments that the Commissioner of Revenue ("the Commissioner") made against him based on unpaid petroleum and sales taxes owed by Twin Cities Avanti Stores, LLC ("Avanti"). The period at issue is September 2008 through April 2009. The amount at issue exceeds

$4 million.[1] In his appeal to our court, Stevens asserts that the tax court erred by granting summary judgment to the Commissioner because (1) there were disputed, material questions of fact regarding his personal liability for the unpaid petroleum and sales taxes, and (2) the court abused its discretion in not allowing additional discovery to explore an estoppel defense.[2] Because there is a material dispute of fact whether Stevens had the requisite control over the company's finances to be held personally liable for Avanti's tax liability, we reverse the tax court's grant of summary judgment in favor of the Commissioner and remand for a trial.

## I.

*Relevant Entities and Stevens's Positions*

The taxes at issue were assessed against Avanti. Stevens argues that the taxes should also have been assessed against a related entity, Twin Cities Stores, Inc. ("T.C. Stores"), because T.C. Stores generated the majority of the petroleum sales that resulted in the tax liability.

T.C. Stores and Avanti were part of a group of affiliated entities in which Nelson held ownership interests. Both T.C. Stores and Avanti owned or operated various retail convenience stores, primarily in Minnesota. Avanti and T.C. Stores did business as Oasis Markets, using the names Oasis Markets, Food and Fuel, Happy Dan's, and Budget Mart. Nelson holds approximately 85% of the stock and

Stevens owns approximately 1% of the stock of RM Group, Inc., the parent, or holding company, for Avanti and T.C. Stores.

Stevens, who has worked in the petroleum fuel industry for more than 20 years, has an undergraduate degree in accounting and a Master of Business Administration degree with a concentration in finance and management. Stevens joined T.C. Stores in 1998. Stevens left T.C. Stores in early 2005 and started a fuel-hauling business. In October 2005 he returned and was given responsibilities for both Avanti and T.C. Stores. After his return, Stevens was "president of RM Group with operational responsibilities over the stores owned by" Avanti and T.C. Stores and was the "President" of both Avanti and T.C. Stores.

*Stevens's Work with Avanti*

Stevens had personnel and human resource responsibilities for Avanti. As a corporate officer, he also signed the consulting agreement to retain a financial consultant, Robert Lovejoy, to "consult and advise on financial matters" for Avanti and T.C. Stores. Lovejoy, who was not an employee of either Avanti or T.C. Stores, prepared weekly cash budgets for review by Stevens and Nelson and directed payments to be made to vendors or creditors after either Stevens or Nelson authorized him to do so. Under the terms of his agreement, Lovejoy could not "make or implement decisions customarily reserved

---

1. In addition to the assessment against Stevens, the Commissioner also assessed Bruce Nelson with personal liability for the same outstanding petroleum and sales tax liability, over the same period of time. The tax court granted summary judgment to the Commissioner on Nelson's appeal, and Nelson has appealed separately to this court. *See Nelson v. Comm'r of Revenue*, 822 N.W.2d 654, No. A11–2015, slip op. 29190085 (Minn.2012).

2. Stevens's argument that the tax court abused its discretion by not allowing additional discovery to explore an estoppel defense is controlled by our decision in *Nelson*. Stevens's argument fails because equitable estoppel is not available on this record as a matter of law.

for directors and officers of a company," including "authorizing disbursements." But, contrary to the terms of the consulting agreement, Stevens viewed Lovejoy as a "CFO" rather than as a consultant:

> [Lovejoy] said he was a consultant. He has hid behind that role. There was nothing about a consultant role that he had. He managed the finances. He would talk to [Nelson] daily. He is the one that made the wires to [Nelson] or [Nelson's] affiliate companies. . . . There was a lot of stuff that went on that I certainly should have known about, at a minimum as a president. Sometimes I will wake up, and the bank would call. We are $400,000 overdrawn. I said, "Bob, what is going on?" I never sent a wire. I never did transfers. . . . I viewed him as a CFO. . . .

In his deposition testimony, Stevens suggested that Lovejoy and Nelson would confer without him and were the ones who were in charge of the company's financial affairs, not Stevens:

> [Lovejoy] was the caretaker here in Minnesota on all of the financial stuff. He talked with [Nelson] every day. . . . Those two would powwow in California and determine what was best for the company. It was down the tubes. It is a dysfunctional company. I took my marching orders. I didn't like it necessarily.

Stevens also exercised operational responsibility for Avanti, which he described as "day-to-day operations to make sure that the things that needed to get done happened." For example, Stevens signed the 2008 application to renew Avanti's petroleum distributor's license with the Department of Revenue ("the Department"). He also authorized the gas purchases needed for store operations and was an authorized signer on several of Avanti's corporate bank accounts. Stevens "regularly arranged, directed or approved inventory purchases which committed [Avanti] to corresponding accounts payable liabilities. Purchase commitments were limited in amount by projected cash balances in cash flow forecasts prepared by [Nelson]."

Stevens's operational responsibilities also included reviewing a weekly cash budget forecast prepared by Lovejoy. The cash budget forecast identified proposed payments to be made for various trade and non-trade accounts, including taxes and utilities. Stevens and Nelson would review the proposed disbursements for the week, and Stevens would provide Nelson with "input" regarding which vendors should be paid based on the cash budget. While Stevens admitted that he was "involved" in the discussions on the company's financial commitments, he said he "was not the decision maker." Stevens knew that Avanti's monthly gas tax liability was approximately $800,000, "depending on what [the] purchases were." But Stevens stated he was never involved with tax return preparation and never signed a tax return for Avanti.

At his deposition, Stevens said that although he made operational decisions, he did not make the "critical decisions":

> Yes, I could make one decision that might involve a million dollars, but it is a tenth of a cent on gas. So that might be viewed as a pretty significant decision, but really not a big deal, it is to the scale.

> Conversely, there could be something that is not that significant; 40 or 50 grand that I would go to [Nelson] because I knew that there would be some resistance or, "What are you spending that kind of money for?" It is hard to explain. I kind of knew there were things that you didn't have much choice[ ].

For example, you are going to run out of gas or replenish gas. So I went and bought the gas. But let's say I wanted to say, "Hey, [Nelson], I decided we want to put mid grade premium back in the tanks," I could never have made that decision. I would have had to be called by him.

There would have been resistance. There were certain things that I made decisions on that there were some bigger dollars involved with, but more day-to-day basic stuff.

Stevens also said that he was involved in operational decisions but not the financial aspects of the company:

The presidential powers, for lack of a better term, weren't like a normal company. There was a financial component to this business, and then there was an operations piece. I was involved in the operations.... I ran his business, but very atypical, in the sense of, I didn't have input on financing things.

Stevens initiated the discussions to sell some of the stores, and then brought together the buyer and Nelson to discuss the price. Regarding his role in the sale of the stores, Stevens described himself as a "mediator"

I think the mediator role is a good way to describe the way it went.... I initiated [the process of selling] some assets. But [Nelson] made the decision to sell the assets. [Nelson] is the one that made the decision what the prices would be.

Stevens also proposed the business model of "dealerizing," rather than operating stores.[3] In his deposition, Stevens said that while he proposed the dealerizing model, Nelson approved it.

Stevens also held "relational" responsibilities with Avanti's suppliers. In that role, he would discuss outstanding sums Avanti owed to vendors, would commit to paying vendors, and would work with Nelson to make those payments. At his deposition, Stevens said that Nelson, on several occasions, refused to authorize payments to vendors. For example, Stevens arranged a meeting between Nelson, himself, and the company's primary grocery supplier, Farner, to discuss the company's $2 million account payable to Farner. In refusing to make a payment to Farner, Nelson told Farner's representatives that they had "basically" given Avanti a loan for $2 million and that was "where it [was] going to stay." Soon thereafter, Farner discontinued deliveries to Avanti's stores. Regarding his lack of authority to make actual payments to vendors, Stevens said:

Sometimes I would sit there and salvage something out. [Nelson] would go, "No," and kill it. It would sour relationships and create contention in the field.... It started out we would not pay them, and they would ship. I would say, "We got this money coming to you." And then it doesn't come. I looked foolish. I would say to [Nelson] and [Lovejoy], "I would rather you tell upfront what we are going to do."

In an answer to an interrogatory, Stevens stated: "Bruce Nelson decided which creditors were to be paid, in what order they were to be paid and when they were to be paid. Robert Lovejoy and Scott Stevens provided input."

### Avanti's Unpaid Tax Liability

Avanti had been behind in payments to its critical vendors from 2007 until the filing of Avanti's bankruptcy petition. It

---

**3.** Stevens describes "dealerizing" as a strategy in which "you basically put a dealer in the store. And he becomes an owner/operator.

We make money on the gas. We charge him rent."

had been in arrears with its main snack/beverage supplier since 2007. Avanti also had been behind in payments to its primary gas supplier, Marathon Oil. Nelson and Stevens discussed options to manage the debt to Marathon, and Nelson explained that they should "short" payments to vendors according to the weekly cash budget forecast.

In November 2008 Lovejoy negotiated payments on Avanti's tax liability, and advised Stevens and Nelson that the Department "expects $85,000 ACH payment on Monday 11/10 and additional payments on successive Mondays until Oct Gas Tax is full paid on 11/23." On December 5, 2008, the Department notified Stevens that "the date for filing and paying October 2008 tax liabilities has come and gone with no filing and no payment." The November agreement was "in default," and the Department informed Avanti that its petroleum license would be suspended at the end of the month. Stevens then reached a new agreement with the Department and advised Nelson and Lovejoy that Avanti owed the Department $100,000 by December 30, 2008.

In early January 2009 Stevens forwarded a copy of Avanti's December petroleum tax filing to his Department contact. Stevens believed that the Department understood, based on the December discussions, that "the installment payments would include the nonpayment in December" so that in January, Stevens and the Department could identify the total amount due and use that as a basis to "define what the repayment plan was going to be. So let's figure out what the number is and break it down in installments." Stevens hoped to continue his discussions with the Department to explore the terms of a repayment plan for Avanti's outstanding tax liability.

By mid-January, a payment plan was reached, under which Avanti would make monthly payments of $400,000 from January through July, until the tax debt (then over $2,400,000) was paid in full. Although Stevens was initially willing to sign the agreement so that Stevens and Nelson would be "aligned," Stevens ultimately did not do so because he had "zero confidence" that the company "could meet the obligations." However, Stevens signed the electronic funds transfer authorization to pay the tax debt.

Avanti failed to comply with its payment obligation. By mid-February, Stevens returned to the Department of Revenue, proposing "daily payments that approximate or average $20,000/day," instead of the $400,000 monthly payment. The Department responded that the proposed plan would be "acceptable for the past due amount." But the Department further explained that if the company was not able to "stay current in addition to the proposed payment plan for the past due amount," the plan would be in default, which would put Avanti's petroleum license at risk.

Given the impending license suspension, Stevens proposed a meeting between the Department and Avanti's representatives. Nelson requested that Stevens draft a proposal for the Department with specific terms: a 24–month payment plan with an abatement of past penalty and interest charges and no pledge of security. Stevens wanted to pledge the proceeds of the sale of one of the company's stores (referred to as the Walgreens deal) to the Department as a down payment, but Nelson refused. In refusing to sign the proposal, Stevens said:

> Basically what I am trying to do is push him to get the Walgreens deal into the repayment plan because I thought that would show good faith.... Basically he didn't want to do it. He was trying to hold that. There is a lot of greed here. "Why would I want to commit that to

them?" I said, "Okay. That is fine. The letter is coming from you. I am not signing it." That got to be an issue with him and I.

The Department declined to accept Avanti's proposal. In a letter dated April 24, 2009, Avanti, through its counsel, Brian McCool, asked the Department of Revenue to reconsider the repayment plan and to "formally recognize that both [Avanti] and [T.C. Stores] are taxpayers responsible for the repayment of these petroleum taxes," in reconsidering the repayment plan.

On June 30, 2009, Avanti and T.C. Stores each filed for Chapter 11 bankruptcy. The Department of Revenue released the tax liens on T.C. Stores on January 23 and 27, 2010. Both Avanti's and T.C. Stores's bankruptcies were converted from Chapter 11 to Chapter 7 bankruptcies, and liquidated.

In a series of orders, the Commissioner held Stevens personally liable for Avanti's unpaid petroleum and sales taxes pursuant to Minn.Stat. § 270C.56, subd. 1 (2010). Stevens appealed the Commissioner's assessments to the tax court. Subsequently, the tax court granted the Commissioner's motion for summary judgment.

## II.

■ "We review an order granting summary judgment to determine if the lower court erred in applying the law and whether any material facts are disputed." *Sanchez v. Comm'r of Revenue*, 770 N.W.2d 523, 525 (Minn.2009). "On issues of material fact, we view the evidence in the light most favorable to the party against whom summary judgment was granted." *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 836 (Minn.2005). "The tax court's conclusions of law and interpretation of statutes are reviewed de novo." *Sanchez*, 770 N.W.2d at 525.

■ The tax court granted summary judgment to the Commissioner, holding that Stevens was personally liable for Avanti's unpaid petroleum taxes because, under Minn.Stat. § 270C.56, subd. 1, he was someone who had control or responsibility for filing returns or paying taxes and failed to do so. In this appeal, Stevens argues that there is at least a material dispute of fact whether he may be held personally liable for Avanti's unpaid tax liability under Minn.Stat. § 270C.56. The tax court, applying *Benoit v. Commissioner of Revenue*, concluded that Stevens met every factor except an entrepreneurial interest. 453 N.W.2d 336, 344 (Minn.1990). But after an examination of the record, we conclude that there is a material dispute of fact whether Stevens had the requisite control over the company's financial affairs to be held personally liable for Avanti's tax liability.

The Commissioner may hold individuals personally responsible for the tax liability of a corporation under Minn.Stat. § 270C.56, subd. 1, which provides:

> A person who, either singly or jointly with others, has the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes and who fails to do so, or a person who is liable under any other law, is liable for the payment of taxes arising under chapters 295, 296A, 297A, 297F, and 297G, or sections 256.9658, 290.92, and 297E.02, and the applicable penalties and interest on those taxes.

The definition of "person" in the statute includes "an officer or director of a corporation." *Id.*, subd. 2. Stevens does not dispute that he is a "person" under section 270C.56, subdivision 2. But he does dispute whether he had the requisite control over financial matters to be found personally liable for Avanti's tax liability.

■ In the past, we have applied the *Benoit* factors to determine whether a "person" is personally liable for a corporation's unpaid sales and withholding taxes. The *Benoit* factors are as follows:

(1) The identity of the officers, directors and stockholders of the corporation and their duties;

(2) The ability to sign checks on behalf of the corporation;

(3) The identity of the individuals who hired and fired employees;

(4) The identity of the individuals who were in control of the financial affairs of the corporation; and

(5) The identity of those who had an entrepreneurial stake in the corporation.

453 N.W.2d at 344. The *Benoit* factors are a functional test for identifying the "responsible person," by considering "those persons who have the power and responsibility to see that the taxes are paid." *Id.* But in *Peterson,* we acknowledged that while the *Benoit* factors may be "informative," the statutory standard controls in determining whether an individual is personally liable for sales tax deficiencies. *Peterson v. Comm'r of Revenue,* 566 N.W.2d 710, 716 (Minn.1997); *see Larson v. Comm'r of Revenue,* 581 N.W.2d 25, 29 (Minn.1998) (holding that "section 270.101 [4] supplies the proper standard" and that the relator "is personally liable if he ha[d] the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes") (citation omitted) (internal quotation marks omitted).

A review of the record shows that there is a material dispute of fact about whether Stevens "ha[d] the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes." Minn.Stat. § 270C.56. It is undisputed that: (1) Stevens was the President of Avanti and T.C. Stores; (2) he had operational duties, including day-to-day management of the company; and (3) he was an authorized signer on Avanti's corporate bank accounts. But Stevens claims that he was not in control of Avanti's financial affairs and "simply lacked the authority in this organization to make or even influence a decision to pay the taxes at issue." Affidavits from key employees of the company provide further evidence that the finances of the company were tightly controlled by Nelson. For example, Richard Webber, the director of operations for Oasis Markets, stated that his "position gives [him] an opportunity to observe who controls the finances of Oasis Markets" and "especially who made the decisions regarding which creditors were paid." Webber stated that Nelson "exercised very tight control over the corporation's funds. Scott Stevens could not overrule Bruce Nelson. I am aware that Scott Stevens has been overruled by Bruce Nelson when it comes to the expenditure of funds." In addition, Karen Pehle, the director of management information systems, stated that Nelson "has exercised very tight control [of the finances] since Oasis Markets [sic] financial problems began a couple of years ago." These statements are further affirmed by Daniel Price, who served as the director of facilities management and capital projects for Oasis Markets.

Although Stevens testified that he held "relational" responsibilities with Avanti's suppliers, his testimony suggests that he may not have had the authority to make

---

**4.** In 2005, the statutory standard for personal liability was moved from Minn.Stat. § 270.101 to Minn.Stat. § 270C.56. *See* Minn. Laws 2005, c. 151, art. 1, §§ 62 & 117 (Aug. 1, 2005). The substance of the standard was not changed.

payments to vendors. For example, Stevens arranged a meeting between Nelson, himself, and the company's primary grocery supplier, Farner, to discuss the company's $2 million account payable with Farner. In refusing to make a payment to Farner, Nelson told Farner's representatives that they had "basically" given Avanti a loan for $2 million and that was "where it [was] going to stay." Soon thereafter, Farner discontinued deliveries to Avanti's stores. Regarding his lack of authority to make actual payments to vendors, Stevens said:

> Sometimes I would sit there and salvage something out. [Nelson] would go, "No," and kill it. It would sour relationships and create contention in the field.... It started out we would not pay them, and they would ship. I would say, "We got this money coming to you." And then it doesn't come. I looked foolish. I would say to [Nelson] and [Lovejoy], "I would rather you tell upfront what we are going to do."

As further evidence that Stevens may not have been in control of the company's financial affairs, Stevens stated, in answer to an interrogatory, that "Bruce Nelson decided which creditors were to be paid, in what order they were to be paid and when they were to be paid." Although Stevens oversaw Avanti's daily gas orders, the "purchase commitments were limited in amount by projected cash balances in cash flow forecasts prepared by [Nelson]." Furthermore, Stevens testified that as "cash got tighter," Nelson's control of the finances became tighter.

After reviewing the record, we hold that there is a material dispute of fact whether Stevens had the requisite control over the company's finances to be held personally liable for Avanti's tax liability. However, per our decision in *Nelson v. Comm'r of Revenue*, 822 N.W.2d 654, No. A11–2015,

slip op. (Minn. Nov. 14, 2012), we hold that the tax court did not abuse its discretion when it denied Stevens's request for additional discovery to pursue an equitable estoppel defense. We therefore affirm in part, reverse in part, and remand for trial.

Affirmed in part, reversed in part and remanded.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.