Yik C. LO, Respondent,

v.

COMMISSIONER OF REVENUE,
Relator.

A16-0918

Supreme Court of Minnesota.

Filed: April 12, 2017

Mark A. Pridgeon, Edina, Minnesota,
for respondent.

Lori Swanson, Attorney General, Michael Goodwin, Assistant Attorney General, Saint Paul, Minnesota, for relator.

Considered and decided by the court without oral argument.

## OPINION

MCKEIG, Justice.

This appeal from the tax court requires us to determine whether a corporate officer who funds and controls a corporation is personally liable for unpaid sales taxes when the corporation is managed by someone else. The tax court held that respondent Yik Lo was not personally liable for the unpaid sales taxes, reasoning that he did not have sufficient functional control over the corporation's operations notwithstanding his formal authority over the business. We reverse.

## FACTS

Yik Lo emigrated from China to the United States in 1974 and was joined by his wife, Yau Lo, and their son, Kee Lo, in 1980.[1] In 1990, Yik and Yau created H.K.D. Lo, Inc. Yik and Yau each owned a 50 percent share in H.K.D. and were directors of the corporation. In addition, Yik was the chief executive officer, president, and secretary of H.K.D., and Yau was the vice president and treasurer.[2] Starting in 1990, Yik and Yau operated several restaurants through H.K.D., the last of which they sold in 2005.

In 2002, Yik and Yau Lo (not H.K.D.) purchased a building with a restaurant on the ground floor. Yik and Yau did not operate the restaurant but instead leased the space to the restaurant's owner. When the restaurant closed in 2004, they decided to either sell the building or open a new business there. Around the same time, Kee decided to open a restaurant called Jun Bo. Jun Bo was Kee's idea, and he initially considered creating a new corporation through which to operate the restaurant. But Yik planned to retire, so he was interested in renting out the space vacated by the previous tenant rather than operating a restaurant himself. Yik advised Kee that operating Jun Bo through H.K.D. would allow Jun Bo to benefit from H.K.D.'s established credit history and supplier relationships. Kee agreed to do so on the condition that he would be "in charge with everything." Yik assented, and Kee therefore decided to operate Jun Bo through H.K.D. Before Jun Bo began operations, Yik secured bank loans for H.K.D., totaling $600,000, to remodel the space and purchase equipment for Jun Bo's operations. Yik, as an officer of H.K.D., also secured Jun Bo's liquor license.

Jun Bo opened for business in June 2006. Yik argues that Kee controlled Jun Bo from the beginning and was "in charge of the entire business." Yik and his other son, Danny Lo, both characterized Kee as the "president" of Jun Bo. Danny believed Kee could have fired him because Kee "was owner and president of Jun Bo." Kee and Danny had the authority to hire and fire any of Jun Bo's employees. Kee also signed most of H.K.D.'s checks, including payroll checks. And Kee decided which bank to use and generally determined when and to whom checks would be issued. Kee also served as H.K.D.'s primary con-

---

1. To avoid confusion, we occasionally refer to the individual members of the Lo family by their first names.

2. In some exhibits, Yik Lo is identified as the secretary of H.K.D., while in other exhibits, Yau Lo is identified as the secretary. For the issues presented in this case, the precise officer roles held by Yik and Yau Lo are not critical because it is undisputed that they were the only two officers of H.K.D.

tact with the Minnesota Department of Revenue. When the Commissioner audited H.K.D. in 2008, Kee notified his parents immediately, and Yik told Kee to "take care of it."

Yik Lo, however, remained an H.K.D. director and officer throughout Jun Bo's existence. As president, H.K.D.'s bylaws gave Yik "general active management of the business of the corporation" and he remained the chief executive officer. Yik signed tax returns for H.K.D. in 2005, 2006, 2007, and 2010. He also signed a power of attorney on H.K.D.'s behalf in 2008.

Yik was also involved in Jun Bo's operations. For example, he received Jun Bo's early bank statements at his home, and drew a salary of around $1,000 per month for occasional work at the restaurant, including cooking, food preparation, and clean up. Yik was an authorized signer on H.K.D.'s accounts at two separate banks (along with Yau, Kee, and Danny), and regularly signed checks on Jun Bo's behalf. For example, Jun Bo paid around $140,000 per year in rent to Yik and Yau Lo in exchange for the leased space in the Los' building. Yik often signed these rent checks, which transferred funds from Jun Bo to himself.[3] Yik also drafted and signed checks from Jun Bo to himself to cover payments to his personal creditors. In fact, Yik signed checks during almost every month of Jun Bo's existence. Checks signed by Yik on Jun Bo's behalf during the tax periods at issue amounted to over $2 million—the largest cumulative amount by any authorized Jun Bo check-signer. Kee often requested that Yik sign Jun Bo's checks when Kee or Danny was busy.

Kee decided to close Jun Bo in 2011 because it was not generating enough business. After Jun Bo closed, Yik and Yau Lo sold the building that previously housed it. In 2012, Yik and Yau, exercising their authority as officers of H.K.D., formally dissolved the corporation.

This case arises out of orders by the Commissioner of Revenue assessing Yik personally liable for sales taxes owed by H.K.D.[4] In 2008, the Commissioner issued an order assessing H.K.D. $260,631.97 in additional sales tax, penalties, and interest for the periods between December 1, 2004, and November 30, 2007. H.K.D. failed to pay the amounts owed. In 2011, the Commissioner issued an order assessing Yik personally liable for H.K.D.'s sales tax liability in the reduced amount of $222,584.08. Also in 2011, the Commissioner issued an order assessing H.K.D. with $82,267.24 in sales tax liability for the periods between April 1, 2008, and May 31, 2011. H.K.D. again failed to pay the amounts owed. In 2012, the Commissioner issued an order assessing Yik personally liable for this sales tax liability in the increased amount of $91,019.30. Yik appealed the orders assessing him personally liable, and the tax court consolidated the appeals.

Following a trial, the tax court concluded that Yik had "formal" status in H.K.D.,

---

**3.** Although both Yik and Yau Lo owned the building at which Jun Bo operated, when Yik signed Jun Bo's rent checks, he addressed them to himself only.

**4.** The Commissioner also assessed Yau Lo, a 50 percent shareholder in H.K.D., personally liable for H.K.D.'s unpaid tax liability for periods between December 2004 and May 2011. The tax court consolidated Yau Lo's appeals

and, applying the same reasoning as in Yik Lo's case, reversed the Commissioner's assessment orders, concluding that Yau Lo was not a person who could be held personally liable under Minn. Stat. § 270C.56 (2016). *Lo v. Comm'r of Revenue*, Nos. 8360, 8453, 2016 WL 1399318, at *18-19 (Minn. T.C. Apr. 7, 2016). The Commissioner did not appeal from the tax court's order in Yau Lo's case.

but that he did not have a significant "functional role" in the corporation's operations. Therefore, the tax court held that, because Yik was not a person who had "control of, supervision of, or responsibility for" filing H.K.D.'s tax returns or paying H.K.D.'s taxes, he was not personally liable for H.K.D.'s unpaid tax debt. This appeal followed.

## ANALYSIS

■ We review the tax court's conclusions of law and interpretation of statutes de novo and its findings of fact for clear error. *Byers v. Comm'r of Revenue*, 741 N.W.2d 101, 105 (Minn. 2007); *see Carlson v. Comm'r of Revenue*, 517 N.W.2d 48, 51 (Minn. 1994) ("Conclusions of law ... are freely reviewable."). Orders of the Commissioner are presumed valid and the taxpayer bears the burden to overcome that presumption. *F-D Oil Co. v. Comm'r of Revenue*, 560 N.W.2d 701, 707 (Minn. 1997).

Minnesota Statutes § 270C.56 (2016) authorizes the Commissioner to assess an individual with personal liability for the unpaid tax liability of a business entity.[5] Section 270C.56 provides:

> **Subdivision 1. Liability imposed.** A person who, either singly or jointly with others, has the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes and who fails to do so, or a person who is liable under any other law, is liable for the payment of taxes arising under chapters 295, 296A, 297A, 297F, and 297G, or sections 290.92 and 297E.02, and the

applicable penalties and interest on those taxes.

*Id.*, subd. 1. The statute defines "person" to include "an officer or director of a corporation." *Id.*, subd. 2. Yik does not dispute that he is a "person" under the statute. Thus, the only question for decision here is whether he is a person with "control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes." *Id.*; *see Igel v. Comm'r of Revenue*, 566 N.W.2d 706, 709 (Minn. 1997) (explaining that when the taxpayer was a corporate officer, the "question is whether he had 'control of, supervision of, or responsibility for' the payment of taxes."). Yik contends, and the tax court agreed, that he did not have the requisite degree of *functional* control over Jun Bo's operations to be held personally liable for H.K.D.'s unpaid sales taxes.

■ The tax court reached this conclusion by "using the *Benoit* factors, then apply[ing] the controlling statutory standard," while also considering whether Yik's authority was formal or functional. We have applied the *Benoit* factors to determine whether a person is personally liable for a corporation's unpaid sales taxes. These factors are:

(1) The identity of the officers, directors and stockholders of the corporation and their duties;

(2) The ability to sign checks on behalf of the corporation;

(3) The identity of the individuals who hired and fired employees;

(4) The identity of the individuals who were in control of the financial affairs of the corporation; and

---

5. Sales taxes that are collected in a taxable transaction are held in trust for and owed to the State. Minn. Stat. § 289A.31, subd. 7(a) (2016); *see Schober v. Comm'r of Revenue*, 778 N.W.2d 289, 291-92 (Minn. 2010). Failure to pay the collected taxes to the State can lead to an assessment of personal liability for the tax debt. *Igel v. Comm'r of Revenue*, 566 N.W.2d 706, 708 (Minn. 1997).

(5) The identity of those who had an entrepreneurial stake in the corporation.

*Benoit v. Comm'r of Revenue*, 453 N.W.2d 336, 344 (Minn. 1990).

We have said that the *Benoit* factors are "informative," and we have looked to these factors in reviewing personal liability assessments. *Peterson v. Comm'r of Revenue*, 566 N.W.2d 710, 716 (Minn. 1997). We have never said, however, that the *Benoit* factors define the statutory standard. To the contrary, we have relied on the plain language of section 270C.56 to determine whether the personally assessed taxpayer has overcome the presumptive validity of the Commissioner's order. In *Peterson*, for example, we stated that "the *Benoit* factors are still informative, [but] we focus instead on the statutory requirement." *Id.* at 716 (discussing Minn. Stat. § 270.101, subd. 1 (2004)).[6] And in *Benoit*, we acknowledged that the Legislature "has clearly stated that the person ... having legal control of the" relevant tax payments is the person "personally liable for nonpayment" of those taxes. 453 N.W.2d at 342. *See also Igel*, 566 N.W.2d at 709-10 (declining to impose a willfulness requirement onto section 270C.56, because such a requirement was "not suggested, much less required, by the plain language of the statute").

■ In other words, the plain language of Minnesota Statutes § 270C.56, subdivision 1, dictates whether a taxpayer is personally liable for a corporation's unpaid tax liability. *Larson v. Comm'r of Revenue*, 581 N.W.2d 25, 28-29 (Minn. 1998) ("[T]he statutory standard ... controls in determining whether an individual is personally liable for sales tax deficiencies."). The *Benoit* factors may be "informative," but they are relevant only when the plain language of subdivision 1 does not yield an answer to the personal liability question. Further, although we have described the *test* for personal liability as "functional," *Benoit*, 453 N.W.2d at 342, we have never incorporated into the unambiguous language of subdivision 1 the formal-versus-functional duality the tax court applied here. And although we have on occasion upheld an assessment of personal liability based on facts demonstrating an individual's actual exercise of control and responsibility in the absence of formal authority in the business, *see, e.g., Larson*, 581 N.W.2d at 29 (noting that the taxpayer "was not a director, officer, shareholder, or employee" of the business but "effectively controlled [the company's] purse strings"); *Peterson*, 566 N.W.2d at 716 (stating that the taxpayer "occupied no official position" in the business but "exercised significant control over the corporation"), we have never reversed a personal liability assessment when an individual's formal role in the business demonstrates "control of, supervision of, or responsibility for" filing and paying taxes. Put differently, an individual's de minimis functional role in a business cannot outweigh evidence that the individual has the formal authority to file tax returns and pay taxes.[7] Such a holding

---

**6.** "In 2005, the statutory standard for personal liability was moved from Minn. Stat. § 270.101 to Minn. Stat. § 270C.56. The substance of the standard was not changed." *Stevens v. Comm'r of Revenue*, 822 N.W.2d 646, 653 n.4 (Minn. 2012) (citation omitted).

**7.** Our decision in *Stevens* is inapposite. In *Stevens*, we reviewed the tax court's grant of summary judgment holding a corporate officer personally liable under section 270C.56. 822 N.W.2d at 652. There, we decided only that summary judgment was improper because there was a material dispute of fact about whether Stevens met the statutory standard for personal liability. *Id.* at 653-54. Because *Stevens* determined only that a material dispute of fact existed, and not that Stevens was actually personally liable, it is not relevant to this case.

would impermissibly stray from the plain language of section 270C.56. *See Benoit*, 453 N.W.2d at 342 (rejecting the tax court's concern that "naked legal control is [not] sufficient" for personal liability because that "conclusion is for the legislature to make and the legislature has clearly stated that the person or persons having legal control . . . [are] personally liable").

We conclude that the tax court committed an error of law by overemphasizing the *Benoit* factors at the expense of the plain language of section 270C.56. Rather than first applying the *Benoit* factors, as the tax court did, we will instead evaluate the tax court's factual findings in light of the statutory standard to determine whether its order is "justified by the evidence." Minn. Stat. § 271.10, subd. 1 (2016). *See also Morton Bldgs., Inc. v. Comm'r of Revenue*, 488 N.W.2d 254, 259 (Minn. 1992) (reversing the tax court's decision after reviewing the statutes, case law, and facts regarding the taxpayer's tax liability).

■ Yik Lo asserts that he is not personally liable because he orally agreed to allow Kee to manage Jun Bo, Kee made all of Jun Bo's business decisions, and Yik never attempted to overrule Kee. For example, Yik contends, Kee decided which banks to use and generally determined when and to whom checks would be issued. And, according to Yik, the record confirms that each member of the Lo family believed Kee to have exclusive control over Jun Bo.

But regardless of Kee's control of Jun Bo, the evidence establishes that Yik Lo had control of and responsibility for filing tax returns and paying H.K.D.'s taxes. Most importantly, Yik signed H.K.D.'s Minnesota S Corporation Tax Returns for 2005, 2006, 2007, and 2010 and its U.S. Income Tax Returns for an S Corporation in 2006, 2007, and 2010. We do not doubt the tax court's finding that Yik signed the tax returns as a matter of convenience because he lived closer to H.K.D.'s accountant than Kee did. But section 270C.56, subdivision 1, imposes personal liability on any person who "has the control of, supervision of, or responsibility for *filing returns* or reports, paying taxes, or collecting or withholding and remitting taxes and who fails to do so." (Emphasis added). We cannot ignore the fact that Yik signed H.K.D.'s tax returns in a majority of the years for which H.K.D. failed to pay sales taxes. *See Larson*, 581 N.W.2d at 30 (describing a taxpayer's preparation of sales and withholding tax returns for the liable corporation as the "most notabl[e]" factor in holding the taxpayer personally liable); *cf. Krech v. Comm'r of Revenue*, 557 N.W.2d 335, 342 (Minn. 1997) (reversing an assessment of personal liability when "the commissioner failed to produce a single sales or withholding tax return actually filed under [the taxpayer's] signature").

Yik's financial involvement with Jun Bo also confirms his control and responsibility. At Jun Bo's inception, Yik took out two loans totaling $600,000 that were used to remodel the premises and purchase restaurant equipment. Jun Bo's early bank statements were sent to Yik's personal residence because Kee lacked a reliable address at the time. In addition to securing Jun Bo's liquor license and working at the restaurant occasionally, Yik regularly wrote large checks on Jun Bo's behalf, including rent checks for thousands of dollars from Jun Bo to himself. Yik occasionally reimbursed himself for personal loans, also by writing checks from Jun Bo to himself. And Yik signed Jun Bo checks issued to various restaurant vendors, most often when Kee and Danny were unavailable. Although Yik did not manage Jun Bo's daily operations, his financial respon-

sibilities with the company were significant and regular.

Yik Lo also possessed expansive authority and responsibility over H.K.D., the corporate taxpayer that operated Jun Bo. He was H.K.D.'s president and chief executive officer, and a 50 percent shareholder of the corporation, at all times during which H.K.D. incurred sales tax liability. Kee, on the other hand, never held an officer position in the corporation. H.K.D.'s bylaws vest its president with "general *active management* of the business of the corporation" (emphasis added), and empower him to "[s]ign and deliver in the name of the corporation any deeds, mortgages, bonds, [and] contracts . . . ." Yik consistently exercised his responsibility for and authority over H.K.D., by securing a liquor license for Jun Bo, granting a power of attorney for H.K.D. in 2008, and dissolving H.K.D. in 2012.[8] In short, Yik retained control of and responsibility for H.K.D. throughout the relevant tax periods. *See Carlson*, 517 N.W.2d at 52 (holding a taxpayer personally liable when the taxpayer "remained in legal control of the corporation even though he chose not to exercise that control").

Under the statutory standard, we are required to determine whether Yik had sufficient control over H.K.D. to impose personal liability for unpaid sales taxes. When the personal liability statute was most recently recodified in 2005, "control" was defined as, in part, "Authority or ability to manage or direct." *The American*

Heritage Dictionary of the English Language 400 (4th ed. 2006); *see also Control, Black's Law Dictionary* (8th ed. 2004) (defining "control" as "The direct or indirect power to direct the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee."). As a 50 percent shareholder with general active management authority and significant financial authority over H.K.D.'s business, Yik Lo had the requisite "control of, supervision of, or responsibility for" H.K.D.'s tax returns and tax payments to establish personal liability for the unpaid sales tax liability of H.K.D. under section 270C.56, subdivision 1.[9]

Our case law supports this conclusion. In *Carlson*, we upheld a personal liability assessment against a company president who funded the company, signed checks on its behalf, had a 50 percent stake in the company, and delegated day-to-day control of the business to someone else. *Carlson*, 517 N.W.2d at 50, 52-53. As the tax court found, Yik Lo shared each of these traits. That Kee Lo demanded and exercised authority over Jun Bo's daily operations does not change the conclusion that Yik Lo had control over H.K.D.'s tax obligations.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the tax court and remand

---

8. Yik's dissolution of H.K.D. took place after the relevant tax periods, but it supports the other evidence showing that Yik had control over H.K.D.

9. We do not reach the question of whether a taxpayer's status as a director or officer of a corporation is itself sufficient to establish personal liability under section 270C.56. We also need not decide whether our refusal to allow

corporate officers to contract or delegate away their duties establishes a "non-alienation" rule, because the facts as found by the tax court clearly establish Yik Lo's personal liability under the plain language of section 270C.56. *See Carlson*, 517 N.W.2d at 52 (stating that a corporate officer may delegate the duties of the office but remains subject to the responsibilities and duties of that office).

for the entry of judgment in favor of the Commissioner of Revenue.

Reversed.